Charles D. Marshall (State Bar No. 236444)
**MARSHALL LAW FIRM**
2121 N. California Blvd., Suite 290
Walnut Creek, CA  94596
Telephone: (925) 575-7105
Facsimile: (855) 575-7105
cdm@marshall-law-firm.com

Jeremy M. Glapion
(*Pro Hac Vice*)
**THE GLAPION LAW FIRM, LLC**
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: (732) 455-9737
Fax: (732) 709-5150
jmg@glapionlaw.com

Attorneys for BRADLEY LA FORCE

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BRADLEY LA FORCE**, <br><br> Plaintiff, <br><br> v. <br><br> **GOSMITH, INC,** and DOES 1-25 <br><br> Defendant. | Civil Case No.: 17-cv-5101 |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL

## ARBITRATION

Defendant, GoSmith, Inc., seeks to compel Plaintiff Bradley La Force to arbitrate his claims arising from Defendant's spam text messages. In so doing, Defendant claims Plaintiff agreed to its terms and conditions when allegedly signing up for Defendant's services. But while Defendant claims to have a record showing that, on October 13, 2015, someone registered an account in Plaintiff's name, Defendant has not provided any information to this Court or to counsel showing the origination of that registration. Instead, Defendant details a generic process and provides an example screenshot of a registration page which, as of the filing of this opposition, neither Plaintiff's counsel nor Defendant's counsel has been able to locate. Defendant's failure to identify the specific origination of Plaintiff's registration (rather than one possible avenue of registration) is fatal to Defendant's Motion. Defendant offers multiple ways for a prospective user to register, some of which make no mention of any terms and conditions whatsoever, and others which do so to varying degrees, depending on the version of the site active at the time. Defendant's failure to provide enough information to identify and analyze the particular option Plaintiff allegedly used here is a failure to meet its burden to show that there exists an enforceable contract.

Furthermore, neither of the two methods – the GoSmith website and smartphone application – through which a person could have registered on October 13, 2015 (that counsel has been able to locate) required registrants to agree to any terms and conditions. The smartphone application makes no mention of the terms whatsoever, and the GoSmith website only contains the terms in a hyperlink in the footer of the page, with no other mention. Neither could have created an enforceable contract.

Accordingly, Defendant's motion should be denied in full.

## BACKGROUND AND PROCEDURAL HISTORY

On September 1, 2017, Plaintiff, Bradley La Force, filed this individual action for damages under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b) based on Defendant Go Smith, Inc.'s practice of sending autodialed telemarketing text messages without consent and

after being asked to stop.

Defendant is a lead generation company that purports to match service professionals with homeowners in need of service. (Compl., ¶ 9.) As part of this service, Defendant sends texts substantially in the form of "[homeowner] is in need of [service]. You have 1st priority. Reply 1 if interested, 3 if not." (*Id.*) Defendant sends these texts using an automatic telephone dialing system. (*Id.* at ¶¶ 10-12.) While these texts appear to be informational based on their content, their purpose is to drive the recipient to purchase credits from Defendant. If a text recipient wants to act on the lead Defendant sends, that person is required to purchase said credits. (*Id.* at ¶ 14.) As a result, Defendant's texts are telemarketing, and Defendant was required to obtain prior express written consent (which is specifically defined in the TCPA) prior to sending its text messages. (*Id.* at ¶¶ 16-17.) Defendant does not obtain prior express written consent, and did not from Plaintiff. (*Id.* at ¶¶ 19-26.)

Furthermore, Plaintiff sought on numerous occasions to be placed on Defendant's "do not call" list, to no avail. (*Id.* at ¶¶ 30-32.) One exchange in particular demonstrates Defendant's extreme unwillingness to honor "do not call" requests. In that exchange, Plaintiff replied "3" to a text to signify "not interested", which prompted an automated response asking Plaintiff to respond with "4 if wrong number, 5 if wrong service area, 6 if you're busy, 9 to stop." (*Id.* at ¶¶ 11, 31.) Plaintiff replied "9" to stop the texts, which prompted yet another reply stating "Okay, we'll pause sending notices of new projects for 7 days. If you wish to unsubscribe and stop all messages, reply STOP." (*Id.* ¶¶ 12, 31.) Plaintiff replied "stop" as requested, and Defendant's system responded yet again, asking Plaintiff "why [he's] not interested? There's no monthly fee and you can get a quote online for free. It is only a small fee for a guaranteed appointment." (*Id.* at ¶ 32.) When Plaintiff did not respond, Defendant resumed its telemarketing texts the following day. (*Id.* at ¶ 33.)

Accordingly, Plaintiff filed the instant suit. Defendant has now moved to compel Plaintiff

3

1    to arbitrate his claims.

2    **LEGAL STANDARD**

3    "Arbitration is a matter of contract and a party cannot be required to submit to arbitration

4    any dispute which he has not agreed so to submit." *Norcia v. Telcoms. Am., LLC*, 845 F.3d 1279,

5    1283 (9th Cir. 2017). "[T]he party seeking to compel arbitration … bears the burden of proving

6    the existence of an agreement to arbitrate by the preponderance of the evidence." *Id.*

7    "The touchstone for all contracts, whether Internet digital or old school paper, is 'mutual

8    manifestation of assent, whether by written or spoken word or by conduct.'" *Nguyen v. Barnes &*

9    *Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). The dispositive questions are "(1) did the offeror

10   'provide reasonable notice' of the proposed terms, and (2) did the offeree 'unambiguously manifest

11   assent to them?'" *Id.* at 1173.

12   Regarding internet contracts, the Ninth Circuit "has settled on an analytical framework that

13   puts 'clickwrap' agreements at one end of the enforceability spectrum and 'browsewrap'

14   agreements at the other." *In re Facebook Biometric Info. Priviacy Litig.*, 185 F. Supp. 3d 1155,

15   1164-65 (N.D. Cal. 2016). "Clickwrap agreements" are agreements where the user is "presented

16   with a list of terms and conditions of use" before being asked to agree to them. *Nguyen*, 763 F.3d

17   at 1176. These types of agreements require users to click on an "I agree" box, manifestly assenting

18   to the terms and conditions. *Id.* "Browsewrap agreements", on the other hand, involve website

19   terms and conditions posted on the website via a hyperlink at the bottom of the screen. *Id.* at 1175-

20   76. For these agreements, the user ostensibly gives his consent simply by using the website or

21   continuing. *Id.* Generally, speaking, if "no affirmative action is required by the website user to

22   agree to the terms of a contract", then it is a browsewrap contract. *Id.* at 1176.

23   In the Ninth Circuit, "the closer digital agreements are to the clickwrap end of the spectrum,

24   the more often they have been held as valid and enforceable." *In re Facebook*, 185 F. Supp. at

25   1165 (citing *Nguyen*, 763 F.3d at 1176). "Browsewrap agreements" have been viewed with

26

27                                    4

28

skepticism. *Id.* (citing *Nguyen*, 763 F.3d at 1178-79 (noting the "traditional reluctance to enforce browsewrap agreements against individual consumers," and declining to find a contract formed where "a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent.")). "Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement." *Nguyen*, 763 F.3d at 1177.

## DISCUSSION

### I.   Defendant Does Not Know Where Plaintiff Allegedly Signed Up and Cannot Meet its Burden of Showing the Existence of an Agreement to Arbitrate.

Defendant, as the party seeking to compel arbitration, bears "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia*, 845 F.3d at 1283. Defendant has failed to meet this burden. While Defendant's motion and declaration indicate that to use Defendant's services, service professionals must register through Defendant's website at [www.gosmith.com](www.gosmith.com) or through its app, Defendant apparently has maintained multiple versions of its registration pages over time, some of which may come closer to creating an enforceable contract than others. Yet absent from Defendant's Motion and supporting papers is any mention of the exact site or app through which Plaintiff allegedly signed up.[1]

The omission of this information from Defendant's submissions does not appear to be an oversight. Instead, Defendant does not maintain this information. The Declaration of Darwin Widjaja, Dkt. 16-1 ("Widjaja Decl."), submitted with Defendant's Motion, claims that Defendant's

---

[1] Plaintiff disputes signing up altogether. How Defendant came to obtain and use Plaintiff's information will be an issue for discovery. Nevertheless, for the purposes of this Motion, Plaintiff will assume that Defendant is accurate that someone purporting to be Plaintiff signed up for its service on October 13, 2015. (Widjaja Decl., ¶ 9.)

Plaintiff's Opposition to Motion to Compel Arbitration, Case No. 17-cv-5101

system logs "the information provided by the professional on the registration screen (i.e. name, business name, trade, phone number, address, etc.), and the date and time the service professional completed his or her registration." Widjaja Decl., ¶ 8. Similarly, in a declaration filed in August 2017 in support of Defendant's motion to compel arbitration in a separate TCPA case pending in the Northern District of Indiana, Defendant's CEO Brenton Marrelli stated that "[w]hen a service professional accepts GoSmith's Terms of Use, GoSmith's system will log: (1) the date and time the service professional completes his or her registration and accept the Terms of use; (2) the device from which registration was completed; and (3) the internet protocol ("IP") address from where registration was completed." *Rojas v. GoSmith, Inc.*, 17-cv-00281, Dkt. 16-2, ¶ 8 (attached hereto as Exhibit A.) Conspicuously absent from both lists is any indication that Defendant maintains information on the specific origination of the registration.[2]

Defendant's inability to identify which of its registration options Plaintiff used when he allegedly signed up makes it impossible for Defendant to meet its burden here, because whether a user of a website has reasonable notice "depends on the design and content of the website and the agreement's webpage." *Nguyen*, 763 F.3d at 1177. The disclosures (both existence and prominence) and page layouts for Defendant's registration options differ significantly. If Plaintiff signed up through the mobile app, the signup process does not mention any terms and conditions at all. *See* Exhibits B and C (screenshots of the mobile application sign up process). If Plaintiff signed up on one of Defendant's websites, the Court needs to be able to determine which website was used to be able to make the fact-specific determinations relevant to whether that page provided reasonable notice and unambiguous assent. Complicating matters, Exhibit C to the Widjaja Decl. appears to show a signup page containing an orange "See Job Matches" button, the source of which is unknown. Plaintiff (through his counsel) has been unable to find this page anywhere on the

---

[2] Also absent from Defendant's submission is information on the device Plaintiff allegedly used and Plaintiff's IP address when registering. Plaintiff's counsel has also requested this information from Defendant's counsel, to no avail.

internet, even after discussing with Defendant's counsel. Neither the current GoSmith signup page nor the signup page as it appeared on October 13, 2015 match what Defendant has submitted. And though Defendant submits this screenshot as an "example screenshot" of the registration page, it provides no basis for its belief that this page is the page through which Plaintiff signed up (as opposed to one of the alternatives) and provides no opportunity for Plaintiff or the Court to conduct the analysis necessary for determining whether such a page creates an enforceable contract.

To illustrate this issue by way of example, if Plaintiff signed up through Defendant's site at http://www.gosmith.com/SignUp.html as it existed on October 13, 2015, there was no notice at the bottom of the registration page stating "I have read and agree to the terms & privacy policy." There was no box that could be toggled to indicate acceptance or rejection of the Terms and Privacy Policy. There was a form requesting basic demographic information, a green "sign up" button (rather than an orange "See Job Matches" button), and text directly below the "sign up" button stating "Already have an account? Sign in." There were no terms presented for agreement to someone signing up, other than those hyperlinked in the footer of the page. This can be seen in Exhibits D and E, which are screenshots from the Internet Archive: Wayback Machine[3] showing how the signup page looked on October 1, 2015 (before the purported signup) and October 16, 2015 (after the purported signup).[4]

---

[3] The Wayback Machine saves snapshots of how websites appeared on certain dates in the past. "Courts have taken judicial notice of the contents of web pages available through the [Internet Archive's] Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Erickson v. Nebraska Mach. Co.*, Case No. 156-cv-01147, 2015 U.S. Dist. LEXIS 87417, *4 n.1 (N.D. Cal. July 6, 2015). Plaintiff respectfully requests that the Court take judicial notice of these documents here.

[4] No screenshot exists on October 13, 2015, but the page appeared the same on both October 1, 2015 and October 16, 2015. Further, Exhibit K shows how the page appeared on June 10, 2017, the most recent date from the Wayback Archive. This shows the check box, and is meant to head off any arguments that it was a display error. Based on the Wayback Machine Archive, the checkbox first appeared between May 10, 2016 and June 2, 2016.

On the other hand, if Plaintiff signed up through http://www.gosmith.com/SignUp.html as currently designed, this presents yet another set of issues. The page contains a large green "sign up" button (rather than the orange "See Job Matches" button), and, on computer monitors at 1920x1080 resolution or below, tablets, and most smartphones,[5] does *not* show the "I agree" check box below the "sign up" button without scrolling down. It is thus possible to fill out the form and click the "sign up" button without ever seeing the "I agree" check box. Because the box is checked by default, clicking the "sign up" button without seeing the box will not present any error message, and will successfully register the user. This can be seen in the Exhibits F through J.

Put simply, Defendant has offered at least four different registration options, three of which can be readily located,[6] and one of which, to date, only exists in Defendant's screenshot. These options each present different issues in determining the enforceability of the arbitration clause in Defendant's terms. They run the gamut from not disclosing the terms at all (the app), to disclosing them in a hyperlink in the page's footer without drawing any attention to them (the gosmith.com signup page on October 13, 2015), to disclosing them next to a pre-checked box most users would have to scroll to see (as currently designed), to the process Defendant shows in a screenshot and argues was compliant with the law (but no one can find).  Defendant's inability or unwillingness to identify from which of these sites Plaintiff's registration originated is sufficient to deny its Motion. If Defendant cannot identify the origination of Plaintiff's supposed registration, it cannot show it provided reasonable notice of its terms, nor can it show Plaintiff's unambiguous assent – both of which are fact-specific inquiries that would require knowing exactly when, how, and where Plaintiff signed up. *Rodman v. Safeway Inc.*, 125 F. Supp. 3d 922, 945 (N.D. Cal. 2015).

---

[5] This was tested on a Samsung Galaxy S8+ phone, which has one of the largest displays and highest resolutions currently available on smartphones.

[6] The app, http://www.gosmith.com/SignUp.html as it existed on October 13, 2015, and the same page as it exists today.

Plaintiff's Opposition to Motion to Compel Arbitration, Case No. 17-cv-5101

Accordingly, Defendant's Motion to Compel Arbitration based on those terms must be denied.[7]

Nonetheless, Plaintiff believes that *none* of the signup processes ostensibly offered to Plaintiff on October 13, 2015 and that Plaintiff's counsel can find were sufficient to create a binding contract between Plaintiff and Defendant. As such, Plaintiff will discuss 1) registration through the app and 2) registration through the website on October 13, 2015. Plaintiff need not discuss the site as currently designed because Defendant's statement that the registration was done on October 13, 2015.

## II.    Signing Up Through the App Does Not Require Agreements to Terms.

Defendant's app, which allows service professionals to sign up for its lead generation service, does not present prospective users with its Terms of Service (or any arbitration agreement) when signing up. Exhibits B and C show what a non-registered user sees when he or she opens the app and the signup page, respectively. As can be seen, there is no place to view the terms and conditions even if one were motivated to do so independently, let alone any box or indication that signing up would bind a person to any such terms. Further, creating an account through the app gives full access to the website, which means it is possible, even today, for an individual to create an account on the app and log in to the website without ever being asked to agree or view any terms. There is no way such a process can be construed to be "reasonable notice" or "unambiguous assent", as required. If a contract would not be enforced when a website's "terms of use is buried at the bottom of the page or tucked in obscure corners of the website where users are unlikely to see it", *Nguyen*, 763 F.3d at 1177, then it goes without saying that Defendant's terms should not be enforced when those terms were nowhere to be found on the registration page and were never

---

[7] At minimum, this may call for the Court to defer ruling on this Motion, and allow for discovery into Plaintiff's purported registration to proceed concurrently with discovery in this case. Whether this will be productive is another story. As mentioned, Plaintiff's counsel has asked Defendant's counsel for more information, but Defendant, for whatever reason, did not provide it prior to the deadline for this opposition.

presented to Plaintiff.

## III.   The October 13, 2015 Website Sign Up Process Was and Is Inadequate to Bind Plaintiff to the Terms.

### a.   On October 13, 2015, the Terms Were a "Browsewrap Agreement".

In Defendant's Motion (and supporting declaration), Defendant provides details of what it claims to be its signup process. Defendant claims that it provided notice and solicited acknowledgement of the terms of use by placing links to the terms of use immediately below a registration button, next to a pre-checked box stating "I have read and agree to the terms and privacy policy." But the process Defendant details is most like the signup process as it is *today*, not how it was on October 13, 2015 when Plaintiff allegedly signed up.

On October 13, 2015, there was no notice at the bottom of the registration page stating "I have read and agree to the terms & privacy policy." There was no box that could be toggled to indicate acceptance or rejection of the Terms and Privacy Policy. There was a form, a green "sign up" button, and text directly below the "sign up" button stating "Already have an account? Sign in." There were no terms presented for agreement to someone signing up, other than those hyperlinked in the page footer. Exhibits D and E. Indeed, Exhibit A to the Widjaja Declaration, which contains the terms in effect at the time of Plaintiff's alleged registration, states that "[r]egardless of whether you register with the Website, your use of the Website and any related services constitutes your agreement to all such terms, conditions, and notices." (Dkt. 16-2.) Such "agreement by use" is the hallmark of a browsewrap agreement. *Nguyen*, 763 F.3d at 1175-76.

### b.  Plaintiff Had Neither Actual nor Constructive Notice of the Terms.

While browsewrap agreements are not *per se* unenforceable, courts are reluctant to enforce browsewrap agreements against individual consumers. *In re Facebook*, 185 F. Supp. at 1165 (citing *Nguyen*, 763 F.3d at 1176-79). The key to the enforceability of a browsewrap agreement is whether the user had "actual or constructive knowledge of a website's terms and conditions."

*Nguyen*, 763 F.3d at 1176 (citation omitted). Plaintiff had neither here. "[T]he onus [is] on website owners to put users on notice of the terms to which they wish to bind consumers." *Id.* at 1179.

For starters, Plaintiff had no actual notice. He did not see or agree to any terms and conditions. Defendant presents no evidence to the contrary. While checking an "I Agree" box might suggest actual notice, on October 13, 2015, there was no box to check. Even if there were, the fact Defendant checks the box by default and places it *after* the "SIGN UP" button cuts against any inference that Plaintiff had actual notice of the terms.

Nor did Plaintiff have constructive notice. "Whether a user has inquiry notice of a browsewrap agreements turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177. This, "in turn, depends on the design and content of the website and the agreement's webpage." *Id.* "Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement." *Id.* "On the other hand, where the website contains explicit textual notice that continued use will act as manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements." *Id.* The key factors are the "conspicuousness and placement" of the terms hyperlink, "other notices given to users of the terms of use, and the website's general design[.]" *Id.* Specifically, "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users or prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on – without more – is insufficient to give rise to constructive notice." *Id.* at 1178-79. Particularly problematic are situations where "a user must scroll down to view [the disclosure] and may proceed to the next page without ever doing so." *McKee v. Audible, Inc.*, Case No. 17-cv-1941, 2017 U.S. Dist. LEXIS 174278, *24 (C.D. Cal. July 17, 2017).

The registration site as it existed on October 13, 2015 is plainly of the variety the *Nguyen*

court, and numerous others, found to be unenforceable. While it is, at best for Defendant, debatable whether the "terms" hyperlink on Defendant's site was "conspicuous" or in "close proximity' to the "SIGN UP" button, it was inarguably "without more." It was buried at the bottom of every page and invariably required a user to scroll to see (though the user was not required to scroll that far to sign up). Such agreements are unenforceable. *Id.*; *see also, e.g., Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 23 (2d Cir. 2002) (applying California law, and refusing to enforce terms that would only become visible to plaintiffs if they had scroll down to the next screen); *In re Zappos.com*, 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012) ("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com webpage among many other links, and the website never directs a user to the Terms of Use."). Accordingly, Plaintiff did not have constructive notice. With neither actual or constructive notice, there can be no enforceable contract.

c.   **Plaintiff Did Not "Unambiguously Manifest Assent" to Defendant's Terms.**

Plaintiff did not, and could not, "unambiguously manifest assent" to Defendant's terms because he had neither actual nor constructive notice that by clicking "SIGN UP", he would be bound to any terms. Cases that have found clicking "SIGN UP" to be sufficient only do so when there is language indicating that clicking "SIGN UP" binds the user to the terms. *See, e.g., Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012).

## CONCLUSION

In light of the foregoing, Defendant's Motion should be denied in its entirety.

**Dated:** October 31, 2017

*/s/ Jeremy M. Glapion*
Jeremy M. Glapion
**GLAPION LAW FIRM, LLC**
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: 732.455.9737
Fax: 732.709.5150
jmg@glapionlaw.com
*(Pro Hac Vice)*

Chuck Marshall
**MARSHALL LAW FIRM**
2121 N. California Blvd., Ste. 290
Walnut Creek, CA 94596
Phone: (925) 575-7105
Fax: (925) 575-7105